## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

ANNE-MARIE KING,          )
      **Plaintiff,**          )
                     )
       **v.**                  )     **Civil Action No. 1:19-cv-31**
                     )
**INOVA HEALTH CARE SERVICES,**   )
**d/b/a Inova Health System**       )
      **Defendant.**       )

### <u>MEMORANDUM OPINION</u>

Plaintiff, a registered nurse in the Trauma Intensive Care Unit at Inova Fairfax Hospital, filed this suit after defendant Inova Health System investigated plaintiff for sleeping beyond authorized breaks during her shifts and took disciplinary action against plaintiff. Plaintiff contends that defendant's actions constituted unlawful retaliation against plaintiff for engaging in protected activities under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

At issue now is defendant's Motion for Summary Judgment on plaintiff's FMLA retaliation and Title VII retaliation claims. Defendant's motion has been fully briefed and orally argued and is thus ripe for disposition.

### I.

Summary judgment is appropriate only when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56, Fed. R. Civ. P. Local Civil Rule 56(B) requires the movant to include in his brief in support of a motion for summary

1

judgment a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed undisputed facts. Local Civ. R. 56(B). Defendant complied with this requirement. The nonmovant must respond to each enumerated fact and either admit or contest by citing to record evidence. *Id.* Plaintiff substantially complied with this requirement by responding to each fact enumerated by defendant and either admitting or contesting defendant's asserted fact.[1] The following list of undisputed facts is derived from defendant's proposed statement of undisputed material facts and plaintiff's responses that dispute defendant's proposed statement of undisputed material facts.

1. Inova is a not-for-profit healthcare system based in Northern Virginia, which employs over 18,000 people.

2. In 2014, Inova hired plaintiff Anne-Marie King as a registered nurse in the Trauma Intensive Care Unit ("TICU") at Inova Fairfax Hospital, and plaintiff is still employed as a registered nurse in the TICU today.

3. From May 2017 until May 2018, Margo Yates-Williams served as an Interim Clinical Director of the TICU and Robert Myers served as the Interim Senior Director of Critical Care, pursuant to a contract between their employer, B.E. Smith, and Inova.[2]

4. From February to June 2018, Yates-Williams reported directly to Myers, and Myers reported directly to Darcy Allen ("Ms. Allen"), the Assistant Vice President of Nursing at Inova.[3] During the same time period, Ms. Allen reported directly to Michelle Vassallo, the Associate

---

[1] Plaintiff also included in her brief an alternative statement of facts in a section entitled "Plaintiff's Statement of Facts Showing Genuine Issues of Disputed Fact." Neither Local Civil Rule 56(B) nor the June 6, 2019 Scheduling Order entered in this case invites or precludes plaintiff from submitting an alternative statement of facts, but the focus of the summary judgment analysis is on the defendant's statement of undisputed facts and the plaintiff's requirement to admit the asserted facts or dispute the asserted facts on the basis of admissible record evidence. Nonetheless, the plaintiff's alternative statement of facts has been carefully reviewed to determine whether any fact listed by plaintiff disputes defendant's facts by citing admissible record evidence.

[2] Plaintiff contends that Yates-Williams was employed jointly by Inova and B.E. Smith, not solely by B.E. Smith. This dispute is not material to the summary judgment analysis because the parties do not dispute that Yates-Williams's actions were attributable to defendant.

[3] Multiple of defendant's employees have the last name Allen. To avoid confusion, Assistant Vice President of Nursing Darcy Allen will be referred to as Ms. Allen, and Director of Security Matthew Allen will be referred to as Mr. Allen.

Chief Nursing Officer, and Vassallo reported directly to Patricia Hill, the Chief Nursing Officer of Inova Fairfax Hospital.

5. Inova's Human Resources ("HR") Department trains its leaders on Title VII and the FMLA and on Inova's policies prohibiting discrimination and retaliation. Inova employees learn how to access Inova's policies during orientation, including its Code of Conduct and policies prohibiting discrimination, harassment, and retaliation.

6. In the summer of 2017, Yates-Williams encouraged plaintiff to apply for one of five newly created RN Unit Supervisor positions in the TICU.

7. On or before November 2, 2017, plaintiff confirmed to Yates-Williams that plaintiff was pregnant and thereafter informed Yates-Williams that plaintiff no longer wanted to apply for the RN Unit Supervisor position.

8. On November 3, 2017, Yates-Williams wrote an email to Kim Santos, Myers, Hasnain Photowala, Vassallo, and Hill that expressed Yates-Williams's disappointment that plaintiff, whom Yates-Williams already knew to be pregnant, was rescinding her application for the RN Unit Supervisor position and might even leave Inova. Yates-Williams's November 3, 2017 email stated that plaintiff is a "seasoned ICU/Trauma RN" and, if she left Inova, it would be a "tremendous loss" to the TICU team.

9. On November 8, 2017, plaintiff formally withdrew her RN Unit Supervisor application.

10. In late February and early March 2018, Yates-Williams, in consultation with Ms. Allen and Myers, promoted five Inova employees to the RN Unit Supervisor positions: Tari Kovacs, Sarah Geyer, Jamie Weaver (née Carver), Krista Borgquist, and Chris Miller. At the time of their selection, Yates-Williams was aware that Kovacs had just returned from FMLA leave, that Geyer and Borgquist were pregnant, that Weaver was trying to become pregnant, and that Miller's wife was pregnant.

11. On January 4, 2018, Yates-Williams spoke to plaintiff in person about a complaint that Yates-Williams understood had been filed against plaintiff by an employee in a separate unit. Yates-Williams asked plaintiff to respond to the complaint and to explain plaintiff's view of the incident by submitting a written Situation, Background, Assessment, and Recommendation ("SBAR"). Plaintiff explained that she did not want to write an SBAR, preferring instead to sit down with the complaining nurse to discuss the incident.

12. On January 5, 2018 at 6:36 a.m., Yates-Williams texted plaintiff, "Please send me an email this morning outlining the expected timeframe (anticipated from xx thru xx) for the FMLA (childbirth/postpartum) you have planned as I'm working on supplemental staffing allocations today with our Executive team."

13. Plaintiff responded to Yates-Williams's text message, writing "If all things go as expected May 1-Aug 1." Yates-Williams asked plaintiff to send an email to Yates-Williams with the same information. In an email to Yates-Williams and Myers on January 5, 2018 at 9:20 a.m.,

3

plaintiff wrote:

> In reference to your text from this morning regarding my plans for future use of FMLA, I was under the impression that I did not have to notify INOVA until just before utilizing it. Please correct this impression if unfounded

14. On January 5, 2018 at 9:26 a.m., plaintiff sent an email to Yates-Williams and Myers, stating:

> As per our conversation during change of shift 1/4 at 1900, I do not wish to answer the "safety always" lodged against me in written form. As I stated to you, I think there may have been a misunderstanding and I would like to clear it up with the other party/parties involved in person. I am more than willing to be flexible with my time and meet the other party/parties at their convenience.

15. Upon receiving plaintiff's emails, Yates-Williams and plaintiff spoke by phone. Yates-Williams sent a follow-up email on January 5, 2018 at 11:56 a.m. to plaintiff, Myers, Vivian Stancil, and Jacqueline Byrum. Stancil and Byrum are both HR representatives. Yates-Williams's email reiterated that the purpose of her request that plaintiff send by email the same information plaintiff had sent by text message regarding her "anticipated timeframe of planned absence from TICU related to pregnancy, delivery date, and FMLA," was to aid Yates-Williams in forecasting staffing needs during the upcoming months, and that in no way had Yates-Williams requested or indicated that plaintiff was expected to submit a request in advance for approval of FMLA leave through Cigna (the entity that manages, approves, and denies requests for FMLA leave for Inova employees) or HR. Yates-Williams further explained the approval process for acquiring supplemental staffing as well as the need to plan early given how many seasoned staff were expected to be out that spring for a variety of reasons, including educational commitments, pregnancy, and FMLA leave for surgery.

16. Due to plaintiff's refusal to write the SBAR (*see* Facts 11, 14) on January 4 and January 5, Yates-Williams also wrote in the follow-up email sent on January 5, 2018 at 11:56 a.m. of Yates-Williams's concern that plaintiff's level of collaboration and cooperation with basic requests had recently declined.

17. In her deposition, plaintiff testified that she felt that at this point—on January 4 or 5, 2018— her relationship with Yates-Williams had begun to deteriorate.

18. Neither Inova nor Cigna held plaintiff to the expected dates or the anticipated time frame for FMLA leave that she had been asked to provide on January 5, 2018, nor did Inova deny plaintiff any FMLA leave plaintiff requested or to which plaintiff was entitled.

19. According to plaintiff, her night shift from February 28 to March 1, 2018, was particularly difficult because plaintiff was tasked with orienting Chris Miller to the role of charge nurse. Plaintiff did not believe Miller to be qualified and therefore gave Miller few responsibilities that night.

20. On her way home from work on March 1, 2018, plaintiff called Stancil, an HR representative, to complain about Yates-Williams's criticism of plaintiff's staffing decisions. During this conversation, Stancil explained that she had been trying to reach plaintiff as part of Stancil's ongoing investigation of Yates-Williams prompted by complaints of other nurses. Stancil told plaintiff that Stancil could not speak further at that time because Stancil needed to attend a meeting, but plaintiff and Stancil arranged to speak again later that day.

21. Plaintiff recalls telling Stancil during their second conversation later on March 1, 2018 that Yates-Williams had insisted that plaintiff put her FMLA needs in writing on January 5, 2018 and then incorrectly interpreted plaintiff's hesitation as uncooperativeness. Plaintiff also provided examples, such as the March 1, 2018 shift, when plaintiff received "push-back"—or criticisms—about plaintiff's staffing decisions, complaints plaintiff had not received from Yates-Williams prior to plaintiff's refusal to put her FMLA needs in writing on January 5, 2018. Stancil encouraged plaintiff to tell Stancil everything. Neither Stancil's nor plaintiff's contemporaneous notes of this conversation reflect that plaintiff stated that Yates-Williams treated plaintiff differently from Yates-Williams's treatment of other nurses because of plaintiff's pregnancy or plaintiff's need for FMLA leave.

22. On March 1, 2018, plaintiff also formally applied for FMLA leave through Cigna.

23. In 2018, Inova's policy required all patient care employees to undergo a purified protein derivative ("PPD") skin test for tuberculosis in the month of their birthday each year or submit a note from a doctor to obtain an exemption.

24. Although plaintiff had received an email from her physician exempting her from the PPD test, the email's encryption prevented her from timely providing this email to Inova. As a result, on March 1, plaintiff was technically out of compliance with Inova's policy concerning PPD tests for tuberculosis.

25. On March 1, 2018, at 2:40 p.m., Yates-Williams sent plaintiff a text message, which Yates-Williams characterized as a "courtesy text," to let plaintiff know that she had "failed to maintain conditions of employment regarding current PPD which expired 2/28," and therefore that plaintiff had been "removed from the TICU schedule per HR policy."

26. On March 1, 2018, at 2:42 p.m., Yates-Williams sent an almost identical text to Brian O'Shea, a male employee, who also had failed to comply with Inova's PPD test policy that month. Yates-Williams treated both plaintiff and O'Shea in the same manner in accordance with Inova's PPD test policy by removing both of them from the schedule.

27. Yates-Williams did not receive notice of plaintiff's formal request for FMLA leave until 3:54 p.m. on March 1, 2018. Thus, Yates-Williams did not know of plaintiff's formal request for FMLA leave when Yates-Williams removed plaintiff from the schedule at 2:40 p.m. on March 1, 2018.[4]

---

[4] Plaintiff concedes that plaintiff's removal from the schedule for failing to comply with Inova's PPD test policy was not retaliatory. *See* Plaintiff's Memorandum in Opposition at 21 n. 3.

28. Similarly, when Yates-Williams removed plaintiff from the schedule on March 1, 2018, Yates-Williams was unaware of plaintiff's March 1, 2018 complaints about Yates-Williams to Stancil. Indeed, Stancil never informed Yates-Williams of any of plaintiff's complaints about Yates-Williams, and Yates-Williams did not become aware of any of plaintiff's complaints to Stancil or any other HR representative regarding Yates-Williams until she received a subpoena in this lawsuit along with a copy of the Second Amended Complaint.[5]

29. Upon learning that plaintiff had provided an exemption note for the PPD test from her physician to Inova on March 1, Yates-Williams returned plaintiff to the TICU schedule, but she informed plaintiff that she wanted to meet with plaintiff in HR without informing plaintiff of the reason for the meeting. Plaintiff later learned that Yates-Williams scheduled the meeting to discuss plaintiff's tardiness and use of unscheduled paid time off ("PTO").

30. Notwithstanding that plaintiff knew her PPD test had technically been out of compliance, plaintiff sent Stancil an email on March 5, 2018 about Yates-Williams wanting to meet with plaintiff in HR, stating "I don't mean to complain but I'm 33 weeks pregnant...I love my job...I really do but I do not need this kind of stress in my life."

31. HR cancelled the meeting that Yates-Williams requested with HR regarding plaintiff's tardiness and unscheduled PTO because, in Stancil's view, Yates-Williams had not previously addressed with plaintiff the issues related to her tardiness and unscheduled PTO.

32. As Stancil had informed plaintiff when they spoke on March 1, 2018, Stancil believed that plaintiff was returning her prior call because Stancil had previously sought to speak to plaintiff about Yates-Williams in connection with Stancil's ongoing investigation of Yates-Williams. Specifically, on January 24, 2018, a clinical technician had complained to Byrum, Stancil's colleague in HR, about Yates-Williams's bullying and "inconsistencies," and, on February 13, 2018, the clinical technician had provided Stancil with a list of employees to contact, including plaintiff.

33. On March 13, 2018 at 9:14 a.m., plaintiff emailed Byrum to inquire as to the status of plaintiff's complaints about Yates-Williams. Specifically, plaintiff wrote:

> Several people including myself have called HR regarding the hostile work environment being fostered by Margo Yates, clinical director. She is singling out staff and bullying them. It is happening to me and to others.
>
> As I told Vivian Stancil, on the phone, yesterday, Margo's bullying has escalated since I've filed my STD/FMLA (maternity leave) paperwork. Is this a federal issue I am dealing with now?

---

[5] Accordingly, defendant's original proposed undisputed fact has been modified to make clear that Yates-Williams did not know of plaintiff's complaints about Yates-Williams to Stancil or any other HR representative until being subpoenaed in connection with this action. Plaintiff has not presented any record evidence to show the contrary.

Although Byrum was on medical leave, Byrum responded to plaintiff's email on March 13, 2018 at 5:20 p.m., writing:

> This issue is currently under investigation and has been escalated to senior management and will be addressed appropriately.
>
> Vivian [Stancil] has updated me and reported all details including your further concerns that you reported to her yesterday. She will follow up with you as soon as possible with a resolution.

34. In connection with Stancil's investigation of the complaint against Yates-Williams concerning her treatment of TICU nurses, Stancil interviewed at least nine TICU employees, including the clinical technician and plaintiff, most of whom expressed similar concerns about how Yates-Williams treated those who agreed with her better than those who did not.[6]

35. None of the interviewees specifically complained that Yates-Williams treated them or anyone else differently because of pregnancy, gender, requests for FMLA leave, or any other protected activity. Nonetheless, based on the complaints, Stancil recommended that Yates-Williams be removed from the TICU due to the number of staff members in the TICU who perceived her leadership style and demeanor as bullying or intimidating.

36. In early March 2018, Ms. Allen hired Chuck Grove to be the permanent Clinical Director for TICU. As a result, as Stancil was completing her investigation into the January 24, 2018 complaint against Yates-Williams, Stancil learned that in any event Yates-Williams would be leaving the TICU.

37. On or before March 22, 2018, Stancil, believing that she was addressing plaintiff's complaints about Yates-Williams, informed plaintiff that Yates-Williams would be leaving the TICU. Plaintiff apparently interpreted Stancil's comment that "you [plaintiff] will not have to deal with her [Yates-Williams]" to mean that Yates-Williams was being removed immediately, rather than after Grove's start date.

38. Inova's Rest and Meal Period policy, in effect at all relevant times, provided guidance for all authorized rest and meal breaks. Nurses typically receive a thirty-minute unpaid meal break and two fifteen-minute paid rest breaks, unit-needs permitting. In the TICU, though it was not routine practice, some staff apparently would combine their thirty-minute and fifteen-minute breaks, but this was not plaintiff's general practice. If plaintiff were going to do this—combine her thirty-minute meal break and two fifteen-minute breaks—she would tell the charge nurse.

39. Yates-Williams's understanding of Inova's policy was that nurses were not allowed to combine their two fifteen-minute breaks with their thirty-minute break. Inova's Rest and Meal Period policy speaks of breaks in the plural and does not address one way or the other

---

[6] Defendant's original proposed undisputed fact has been modified to reflect that there is no dispute that Stancil conducted the interviews described above in response to the January 24, 2018 complaint.

whether the unpaid meal break could permissibly be combined with the two paid rest breaks.

40. Ms. Allen, the Assistant Vice President of Nursing at Inova, testified that it would not be appropriate for a charge nurse to allow a staff member to combine a thirty-minute break with two fifteen-minute breaks on a night that was so busy that another staff member would not get to take a meal break at all.

41. On March 1, 2018, at the end of the night shift in which plaintiff had been tasked with orienting Miller to the charge nurse role, Yates-Williams had requested to meet with both plaintiff and Miller, but plaintiff was unable to do so as she had an appointment.

42. When Yates-Williams met with Miller, Miller complained that plaintiff had given Miller few responsibilities during their shift, an assessment with which plaintiff agrees.

43. In her discussion with Miller, Yates-Williams also learned for the first time that plaintiff was known to take "safety naps," during which she would sleep on her shift. Miller's March 2, 2018 email to Yates-Williams memorializing their discussion reported that plaintiff had taken a twenty-eight-minute "safety nap" during the March 1 night shift despite having already taken a thirty-minute meal break.[7]

44. On March 15, 2018, Yates-Williams received an email from a TICU nurse, Jillian Pennington. Yates-Williams understood from Pennington's email (i) that Pennington was clocking out from Pennington's night shift without having had a meal break and without having received a second break for her lactation needs, (ii) that the unit had been extremely busy with high acuity (i.e., higher-needs patients), (iii) that the charge nurse [not plaintiff] had been very busy helping other nurses, and (iv) that the trauma blue responder[8] [plaintiff] had been "off the unit." Yates-Williams had no reason not to believe Pennington with respect to why she was unable to take her breaks.[9]

45. Upon receiving Pennington's email, Yates-Williams reviewed the prior night's assignment sheet and learned that plaintiff had been serving as the trauma blue responder, whom Pennington had reported to be "off the unit." Yates-Williams also received a text message from Borgquist, from which Yates-Williams had initially understood that plaintiff had taken a three-hour nap during that shift and caused Pennington to miss her meal and lactation

---

[7] Although plaintiff disagrees with the conclusion that Yates-Williams drew from Miller's email, plaintiff does not show a genuine dispute as to what Miller communicated to Yates-Williams in the March 2, 2018 email, namely that Miller had "no doubt that [plaintiff] was sleeping during this time as it is well known that she takes 'Safety naps' (Her words) when she is on night shifts." Miller's March 2, 2018 email to Yates-Williams.

[8] As Yates-Williams stated in her deposition testimony, a trauma blue responder is "a nurse who is qualified to go down to the emergency room when a trauma [emergency] was called in because we're a Level 1 trauma center." Yates-Williams Dep. Tr. at 40:8–11.

[9] Plaintiff disagrees with the conclusion that Yates-Williams drew from Pennington's March 15, 2018 email, but plaintiff does not show a genuine dispute as to what Pennington communicated to Yates-Williams in the March 15, 2018 email or as to what Yates-Williams's concluded based on that March 15, 2018 email.

breaks.[10]

46. After receiving these reports from Pennington and Borgquist, Yates-Williams asked other Inova employees if they had witnessed plaintiff sleeping on extended breaks. On March 15, 2018, Yates-Williams learned from Michelle Lee that, during Leadership Training in August 2017, plaintiff had shared with other Leadership Training participants that she took "safety naps" while working on the night shift. Yates-Williams had no reason not to believe Lee.

47. Plaintiff suspected that Yates-Williams was investigating plaintiff's sleeping during shifts when plaintiff heard from another nurse, Natalie Grieb, that Yates-Williams had asked Grieb on March 15, 2018, if she had witnessed anyone on the night shift taking safety naps.

48. In the morning on March 15, 2018, Yates-Williams further investigated plaintiff's alleged sleeping during extended breaks by reviewing available video footage with Inova's Director of Security, Matthew Allen ("Mr. Allen"). Mr. Allen assisted Yates-Williams by pulling the available security videos, which included plaintiff's night shifts on February 28–March 1, March 12–13, and March 14–15. Yates-Williams reviewed the footage to determine whether the footage validated her staff's complaints about plaintiff sleeping during extended breaks.[11]

49. On the most recent night shift, from March 14 to March 15, 2018—the same shift during which Pennington reported she did not get her meal or second lactation breaks—Yates-Williams and Mr. Allen observed plaintiff take a blanket out of the blanket warmer and enter the nursing lounge with it at 3:42 a.m. and not exit until 4:44 a.m., an hour and two minutes later. The video did not reflect a three-hour break as Borgquist had reported, but Yates-Williams still believed this footage corroborated Pennington's report to her about that shift, and she further believed that more than one hour in the nursing lounge on a busy night was excessive.[12]

50. Yates-Williams believed the other security videos showed the same trend of plaintiff, late into her shift, around 4:00 or 5:00 a.m., getting a warm blanket and going into the nursing lounge.

51. Although Yates-Williams initially had been shocked to hear from Miller that it was well-known that plaintiff took safety naps during her shift, including his report of a 28-minute safety nap in addition to a meal break on the February 28-March 1 night shift, Yates-Williams believed the security footage from March 1, which reflected that plaintiff entered

---

[10] Although plaintiff disputes the reliability of the information in Borgquist's text message and disagrees with the conclusion that Yates-Williams drew from that information, plaintiff has not shown a genuine dispute as to what Borgquist communicated to Yates-Williams in her March 15, 2018 text message.

[11] Plaintiff argues that the video footage did not validate staff complaints, but plaintiff does not show a genuine dispute as to whether Yates-Williams reviewed the video footage for the purpose of determining whether it validated staff complaints.

[12] Although plaintiff disagrees with Yates-Williams's conclusion based on the video footage, plaintiff has not shown a genuine dispute of fact as to Yates-Williams's interpretation of the video footage as corroborative of Pennington's March 15, 2018 email or Yates-Williams's belief that plaintiff's break was excessive.

the nursing lounge with a warm blanket at 4:02 a.m. and she exited at 4:27 a.m., corroborated his report, and she had no reason not to believe him.[13]

52. On the night of March 15, 2018, Yates-Williams sent a series of emails to Ms. Allen, Myers, and Stancil, in which she advised them, among other things, that the security footage she reviewed with Mr. Allen that morning validated staff statements that plaintiff gets a warm blanket and then spends lengthy time frames in the nursing lounge taking what she refers to as "safety naps" during her shifts. Yates-Williams also forwarded to Ms. Allen, Myers, and Stancil the emails she had received from Miller, Pennington, and Lee.[14]

53. The next morning, on March 16, Ms. Allen, Yates-Williams, Myers, and Stancil reviewed the material that Yates-Williams had collected with respect to the night shifts on February 28–March 1, March 12–13, and March 14–15. Yates-Williams was subsequently asked to send the material by email in a more organized fashion.

54. After Ms. Allen, Yates-Williams, Myers, and Stancil met on March 16, 2018, Yates-Williams, Stancil, and plaintiff participated in a phone conversation in which Yates-Williams placed plaintiff on administrative leave without pay[15] in connection with the investigation into her alleged sleeping for over an hour on her last shift.[16]

55. During her administrative leave, plaintiff informed Inova employees, including Dr. Jill Watras, Kara McGlesson, Heribert Bacareza, Lindsay Knight, and Kelly Coble, that she had been placed on administrative leave for sleeping over an hour on her last shift. Plaintiff also stated, "I always set my alarm for twenty minutes" and "as far as I and the charge nurse know, I was back in 20 minutes." In none of her texts or emails did plaintiff state that she had asked to take an hour-long break or that she had asked to combine her thirty-minute meal break and two fifteen-minute rest breaks on her last shift.

56. On March 18, 2018, Yates-Williams prepared and emailed to Ms. Allen, Stancil, and Myers the previously-requested two organized packets of the materials that Ms. Allen, Stancil, and Myer had reviewed on March 16, 2018.

---

[13] Plaintiff disagrees with Yates-Williams's interpretation of Miller's report and the security video footage but has not cited record evidence that shows the contrary.

[14] Plaintiff argues that the footage does not validate any complaints regarding her behavior, but plaintiff cannot show a genuine dispute as to whether Yates-Williams advised the recipients of her emails that the footage validated the complaints.

[15] In her deposition, Stancil testified that she placed plaintiff on paid administrative leave, not unpaid. Solely for purpose of summary judgment, Inova assumes the administrative leave began as unpaid, pending Inova's decision as to the appropriate level of discipline. As noted *infra*, plaintiff was ultimately paid for this administrative leave.

[16] Plaintiff disputes this fact, arguing that Stancil's March 16, 2018 email referred to "the issue of her sleeping" in general, not on a specific occasion. This is not a disputed issue of material fact because Stancil's email regarding the investigation into the "issue of her sleeping" does not contradict plaintiff's testimony that Yates-Williams's stated reason for placing plaintiff on administrative leave was plaintiff sleeping over an hour on plaintiff's last shift.

57. After doing so, Yates-Williams was not involved in any further conversations about plaintiff's discipline or in the decision to issue a Final Written Warning to plaintiff.

58. On March 22, 2018, Vassallo, Ms. Allen, Hill, Stancil, and Jeffrey Pratt (Stancil's supervisor in HR) met to discuss the appropriate discipline for plaintiff. Yates-Williams did not participate in the meeting. The group reviewed the security footage, which showed a trend of plaintiff taking warm blankets into the nursing lounge and culminated with her remaining in the nursing lounge over an hour on her last shift, during which time they believed she had been sleeping based on the staff's reports of her "safety naps." As a result, the group understood plaintiff had been unreachable by other staff, at least one of whom had reported missing her own meal and lactation break as a result of plaintiff being "off the unit."[17] Since the group had the security footage, they did not believe they needed to speak to anyone else. Vassallo and Ms. Allen considered termination and discussed whether plaintiff had abandoned patients or abandoned duties. As plaintiff did not have patients under her care, the group concluded that she had abandoned her duties by sleeping beyond her thirty-minute meal break on a busy night in the TICU. Although "sleeping during scheduled shifts, except for authorized breaks in authorized break areas" is a Group 2 violation for which an Inova employee may even be terminated under Inova's Progressive Discipline policy, HR recommended a Final Written Warning, at least in part because Inova typically issues a final warning in lieu of termination for a first offense of sleeping beyond or outside of an authorized break time or break area.

59. Ultimately, Vassallo made the final decision to issue a Final Written Warning to plaintiff for sleeping in excess of her authorized breaks, consistent with what Vassallo understood to be Inova's typical practice.[18]

60. At the time Vassallo made the decision to issue plaintiff a Final Written Warning, Vassallo herself was also pregnant and scheduled to begin FMLA leave within a couple of weeks, and she was unaware that plaintiff had complained about Yates-Williams or Inova.[19]

61. On March 22, 2018, only six days after plaintiff was placed on administrative leave, Stancil informed plaintiff that she would not be terminated, and a meeting was scheduled in HR for the following Monday, March 26, 2018.

---

[17] Although plaintiff disagrees with the conclusion drawn by the participants in the March 22, 2018 meeting that plaintiff was unreachable during her break, plaintiff cites no record evidence that shows a genuine dispute as to the participants' belief about plaintiff's unreachability.

[18] Plaintiff disagrees with Vassallo's conclusion, but plaintiff has not shown a genuine dispute as to this stated fact, namely that Vassallo made her disciplinary decision because Vassallo believed that plaintiff had slept in excess of authorized breaks.

[19] Defendant's originally proposed undisputed fact has been modified to remove the legal conclusion that Vassallo was not retaliating against plaintiff when Vassallo made the decision to issue the Final Written Warning to plaintiff. Additionally, although Vassallo knew that several nurses had complained about Yates-Williams based on Dr. Jill Watras's March 15 email communicating unnamed nurses' concerns about Yates-Williams bullying and intimidation of nurses in the TICU, plaintiff has not shown a genuine dispute as to Vassallo's lack of knowledge of plaintiff's complaints about Yates-Williams or Inova.

.

62. Pursuant to Inova's Progressive Discipline Policy, by not terminating plaintiff, plaintiff's administrative leave was to be paid. Once plaintiff was reinstated, she received pay for every shift that she had missed, and her paycheck was not delayed.

63. On March 26, 2018, Byrum returned to work from her own family medical leave and attempted to assist Stancil by preparing the Final Written Warning to be issued to plaintiff from the documentation compiled by Yates-Williams. The Final Written Warning prepared by Byrum was issued to plaintiff by Stancil and Myers for her sleeping during her three previous night shifts without authorization of a break.[20]

64. On March 26, 2018, Yates-Williams received an instruction from Myers to place plaintiff back on the schedule, but not as "charge." Thus, because Yates-Williams received this instruction from Myers, Yates-Williams did not permit plaintiff to serve as a charge nurse or as a trauma blue responder, which Yates-Williams considered to be a co-charge role.[21]

65. Before plaintiff began FMLA leave, plaintiff's attorney sent a letter of representation to defendant on April 10, 2018.[22]

66. On August 2, 2018, Inova voluntarily rescinded the Final Written Warning. Stancil also confirmed with Grove that plaintiff was eligible to serve as a charge nurse and trauma blue responder.[23]

67. In August 2018, plaintiff reviewed her personnel file and confirmed the removal of the Final Written Warning. Although, in this litigation, she learned that HR keeps the Final Written Warning in a separate file (in part to comply with her attorney's request to preserve all evidence), Inova has submitted sworn testimony confirming that no one other than HR, including plaintiff's supervisors, can access this separate file. Plaintiff is not aware of any adverse consequences because of this separate file.

---

[20] Plaintiff argues that she was not asleep and that her breaks were authorized, but plaintiff's contentions in this regard do not create a genuine dispute as to the stated reason for the issuance of the Final Written Warning. *See* March 26, 2018 Final Written Warning ("This final warning is being issued for sleeping during your scheduled shift without the authorization of a break. On 2/28/18, 3/12/18, and 3/14/18 you abandoned the patient care areas when you slept in the staff lounge during your scheduled shift.").

[21] Although plaintiff disagrees with Yates-Williams's interpretation of Myers's instruction, plaintiff has not cited any record evidence to dispute Yates-Williams's statement that she understood both charge nurse and trauma blue responder to be charge roles.

[22] Defendant's original proposed undisputed fact has been modified to remove defendant's contention that plaintiff "grieved" the issuance of the Final Written Warning through the April 10, 2018 letter sent by plaintiff's counsel. There is no dispute that plaintiff's counsel sent a letter to defendant on April 10, 2018.

[23] Defendant's original proposed undisputed fact has been modified to remove defendant's contention that plaintiff rescinded the Final Written Warning upon receiving notice that plaintiff considered its issuance to be retaliatory. Neither party disputes that the Final Written Warning was removed from plaintiff's personnel file on August 2, 2018.

68. Since July 2018, plaintiff has had no problems requesting FMLA leave, including for her current pregnancy.

69. When Yates-Williams joined Inova, the TICU decided which nurses working only night shifts or working a mix of both day and night shifts—referred to as a 50/50 rotating day and night shift—would move to available permanent day shift positions according to lists of nurses who had requested permanent day shifts.

70. In early January 2018, Yates-Williams began creating a new system, by which the priority granted to nurses requesting a permanent day shift position would be based on points awarded for criteria such as seniority or committee involvement. Yates-Williams began with a list of the nurses who had requested a permanent day shift position as of the end of September 2017. Plaintiff's name was not on the list as of the end of September 2017 because plaintiff had not requested a permanent day shift position.

71. After calculating points for the nurses in the TICU who had requested to move to a permanent day shift position, Yates-Williams decided that it would be better to calculate the points of all TICU nurses, so that their points would be available if any other nurse requested a permanent day shift position. To this end, Yates-Williams tasked the unit secretary, Tammy Baker, with verifying data used to calculate point totals for all TICU nurses.

72. Baker created a Points Eligibility spreadsheet that listed all TICU nurses and solicited information from the TICU nurses, such as number of years of experience in TICU and prior to joining Inova, upon which points would be awarded. The list was posted in a break room and sent to nurses via email. Yates-Williams understood that Baker highlighted a cell of the spreadsheet in yellow to indicate missing information, and Baker highlighted the "total points" cell in red to indicate that the total could not be calculated due to missing information.[24]

73. On March 1, 2018, Baker texted plaintiff to ask for the number of years she had worked as a nurse prior to Inova for the Point Eligibility spreadsheet for shift preference. Plaintiff, who was working a 50/50 rotating day and night shift, replied, "I'm not interested in changing my shift." Plaintiff later sent Baker a text message stating that plaintiff began to work as a nurse in "9/2006…I think."[25]

74. Yates-Williams also understood that plaintiff did not wish to change her shift to a permanent

---

[24] Defendant's original proposed undisputed fact has been modified to reflect that Yates-Williams understood yellow highlighting to signify missing information, not missing or unconfirmed information, and that Yates-Williams understood that the total points column would be highlighted in red if the total could not be counted due to missing information, not because the total may not be accurate. Yates-Williams Dep. Tr. at 267:8–268:1.

[25] Plaintiff contends that she was interested in moving to a permanent day shift but stated that she did not wish to change her shift to avoid increased interaction with Yates-Williams. Notwithstanding plaintiff's explanation of her desire not to change shifts, defendant's stated fact accurately reflects plaintiff's reply. Defendant's original proposed undisputed fact has also been modified to include plaintiff's subsequent text message responding to Baker's original question.

day shift position.[26]

75. On March 10, 2018, Yates-Williams circulated a recent draft of Baker's Points Eligibility spreadsheet to all nurses in the TICU, advising them that, in an effort to decrease the number of nurses working 50/50 rotating day and night shifts, Inova would implement a point system to approve permanent day shift placements in or around April 22, 2018. Yates-Williams then instructed, "Please do take a moment to review our initial 'Point System Eligibility for Shift Preference' sheet," and "advise via email of any changes/corrections that need to be made." Yates-Williams also listed the nurses that "current data" reflected as next up for a permanent day shift position, but her list did not include plaintiff. The initial "Point System Eligibility for Shift Preference" spreadsheet attached to Yates-Williams's March 10, 2018 email had plaintiff's points total highlighted in red.

76. Plaintiff never advised Yates-Williams that her name had been omitted from the email, nor did plaintiff ever ask why her points total on the draft spreadsheet was shown highlighted in red. Plaintiff also did not ask to move to a permanent day shift position. Instead, at that time, plaintiff preferred to work more night shifts because the night shift allowed her to avoid contact with Yates-Williams.

77. On April 12, 2018, Ms. Allen modified the Points Eligibility Spreadsheet and authorized the TICU to implement the point system for all TICU nurses.[27]

78. Thereafter, the staffing committee would decide who to move to permanent day shifts based on the point system as positions became available. Yates-Williams was not involved in any of those decisions once the point system was implemented.

79. Yates-Williams failed to complete evaluations for many nurses in the TICU in early 2018. Because an evaluation is a requirement for a $2.20 per hour pay differential to be paid to RN-3 and RN-4 nurses under the ADVANCE Clinical Ladder program, the delayed evaluations delayed these pay differentials.

80. On August 9, 2018, Ms. Allen learned that the TICU evaluations remained overdue, which affected a "tremendous" amount of people.

---

[26] Although plaintiff argues that other nurses who had no interest in moving to a permanent day shift did not have their point totals highlighted in red on the spreadsheet, plaintiff's argument in this regard does not show a dispute as to defendant's proposed fact, namely that Yates-Williams believed that plaintiff did not wish to switch to a permanent day shift position.

[27] Plaintiff argues that the point system was implemented by January 2018 and as early as September 2017, but plaintiff's cited record evidence does not support this argument. Yates-Williams's January 2018 email shows that defendant had chosen criteria that would determine a nurse's point total and states that the point system would be used to determine who received a permanent day shift "[b]eginning this planning schedule of April 22, 2018." Yates-Williams March 10, 2018 email. The September 2017 chart calculates point totals for nurses who had requested permanent day shifts, which plaintiff had not done, and thus does not create a genuine dispute as to the effective date of the point system's application to all TICU nurses to determine who received an opportunity to switch to a permanent day shift. *See* Facts 70–71.

14

81. When plaintiff reported a delay in receiving her RN-3 pay differentials for certain pay periods, HR discovered that her evaluation was one of the ones missing. As a result, plaintiff, like other RN-3 and RN-4 nurses participating in the program, was not timely receiving her pay differentials.

82. Grove completed plaintiff's evaluation in the fall of 2018, and by November 9, 2018, before she filed this lawsuit, plaintiff had received all RN-3 pay differentials that were owed to her as of November 2018.[28]

## II.

The summary judgment standard is too well-settled to warrant extensive discussion. Summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322. To avoid summary judgment, the opposing party must set forth specific facts showing a genuine issue for trial that are "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III.

Defendant contends that it is entitled to summary judgment (i) because plaintiff has not sustained an injury-in-fact that confers Article III standing with respect to her FMLA retaliation claim as a result of defendant's corrective action, (ii) because plaintiff has not presented any evidence to show a triable issue of fact regarding the relevant decisionmakers' knowledge of plaintiff's Title VII protected activity and thus cannot prevail on her Title VII retaliation claim, and (iii) because plaintiff has not presented evidence to show a triable issue of fact as to whether

---

[28] Plaintiff concedes that plaintiff's delayed receipt of her RN-3 pay differentials was not retaliatory. *See* Plaintiff's Memorandum in Opposition at 21 n. 3.

defendant's non-retaliatory reasons for its adverse employment actions were pretextual and thus cannot prevail on either her FMLA retaliation or Title VII retaliation claims. For the reasons that follow, defendant is entitled to summary judgment on plaintiff's FMLA retaliation claim because plaintiff lacks standing and on plaintiff's Title VII retaliation claim because neither Yates-Williams nor Vassallo knew of plaintiff's Title VII protected activity. Because plaintiff cannot prevail on either her FMLA retaliation or Title VII retaliation claim, it is not necessary to address defendant's argument that plaintiff cannot show with respect to either claim that a triable issue of fact exists as to whether defendant's legitimate non-retaliatory reasons for its actions were pretextual.

**A.**

Defendant argues that plaintiff lacks standing to pursue her FMLA retaliation claim because defendant has already rescinded any adverse actions against plaintiff. For the reasons that follow, defendant is entitled to summary judgment on plaintiff's FMLA retaliation claim because plaintiff lacks a redressable injury-in-fact due to defendant's corrective action.[29]

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases or controversies." U.S. Const. art. III. It is well-established that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

---

[29] The analysis that follows does not apply to plaintiff's Title VII retaliation claim because plaintiff has standing to pursue her Title VII retaliation claim and defendant has not argued otherwise.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan*, 504 U.S. at 560–61).

To prevail on an FMLA retaliation claim, "an employee must prove, as a threshold matter, that the employer violated § 2615" by engaging in discrimination because of a plaintiff's FMLA protected activity. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). But "[e]ven then, § 2617 provides no relief unless the employee has been prejudiced by the violation." *Id.* Specifically, under the FMLA's enforcement provision, an employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation" § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). *Id.*

Plaintiff has not established standing for her FMLA retaliation claim because plaintiff cannot show any FMLA violation or retaliation that caused a redressable injury-in-fact. In this respect, the summary judgment record reflects that plaintiff lost neither compensation nor benefits as a result of defendant's actions. The record also reflects that, before plaintiff filed this action, plaintiff was eligible to serve as a trauma blue responder and that the Final Written Warning no longer appeared in plaintiff's personnel file.[30] And plaintiff suffered no actual injury based on any denial of an opportunity to request a permanent day shift position to which she was entitled based on seniority because no such opportunity was available and because plaintiff had already unequivocally stated that she was "not interested in changing [her] shift." Part I, Facts

---

[30] Plaintiff's Second Amended Complaint also alleged that plaintiff suffered adverse actions when defendant removed plaintiff from the schedule due to plaintiff's delayed submission of her PPD exemption form and temporarily delayed paying plaintiff's RN-3 payment differentials. Plaintiff now concedes that these actions were not retaliatory, *see* Plaintiff's Memorandum in Opposition at 21 n. 3, but it is notable that defendant took prompt corrective action to address plaintiff's removal from the schedule and the delayed payment of plaintiff's RN-3 payment differentials. *See* Facts 29, 82, *supra.*

17

73–74, 78; *see also Friends of the Earth, Inc.*, 528 U.S. at 180–81 (stating that an injury-in-fact may not be "conjectural or hypothetical") (quoting *Lujan*, 504 U.S. at 560–61).[31] Because plaintiff presents no evidence of ongoing or imminent future harm based on defendant's actions, plaintiff lacks standing to pursue the prospective injunctive relief she seeks. *See Lujan*, 504 U.S. at 564 (observing that allegations of past injury "do[ ] not in [themselves] show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Plaintiff's emotional distress and attorney's fees do not constitute injuries-in-fact for which the FMLA provides redress. The FMLA does not provide for emotional distress damages. *See Settle v. S.W. Rodgers, Co.*, 998 F. Supp. 657, 666 (E.D. Va. 1998) ("Thus, by its own terms, the FMLA does not provide for either punitive damages or for damages for emotional distress.") (citing 29 U.S.C. § 2617(a)(1)(A)), *aff'd*, 182 F.3d 909, 1999 WL 486643 (4th Cir. 1999); *see also Rodgers v. City of Des Moines*, 435 F.3d 904, 909 (8th Cir. 2006) (same).[32] And where, as here, a plaintiff has no ability to obtain a favorable judgment for damages or equitable relief, attorney's fees are not a redressable injury-in-fact because a favorable judgment is a prerequisite

---

[31] To be sure, at the motion to dismiss stage, plaintiff had standing with respect to her FMLA retaliation claim based on the alleged denial of an opportunity to request a permanent day shift position. *See King v. Inova Health Care Servs.*, 1:19-cv-31 (E.D. Va. May 22, 2019) (Order). But plaintiff has not satisfied her burden at the summary judgment stage to show a genuine dispute as to whether this alleged injury was an actual injury-in-fact rather than a merely hypothetical injury. *Lujan*, 504 U.S. at 561 (noting that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" but that "[i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations . . . ."). More specifically, the summary judgment record demonstrates that plaintiff disclaimed any interest in a permanent day shift position. *See* Part I, Fact 73.

[32] Importantly, Title VII retaliation claims are distinct from FMLA retaliation claims in that a Title VII retaliation plaintiff may recover for emotional distress. *See Bryant v. Aiken Regional Medical Ctrs. Inc.*, 333 F.3d 536, 546–47 (4th Cir. 2003) (holding that an award of compensatory damages for emotional distress may be based on a plaintiff's testimony showing a causal connection between a violation and emotional distress) (citing *Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 653 (4th Cir. 2002)); *see also West v. Gibson*, 527 U.S. 212, 219 (1999) (noting that Title VII plaintiffs are entitled to damages to "'help make victims whole'") (citing H.R. Rep. No. 102–40, pt. 1 pp. 64–65 (1991) U.S. Code Cong. & Admin. News 1991 pp. 549, 602–603).

for an FMLA attorney's fees award. *See McDonnell v. Miller Oil Co., Inc.*, 134 F.3d 638, 640 (4th Cir. 1998) ("The FMLA provides in pertinent part that the district court 'shall, in addition to any judgment awarded to plaintiff, allow a reasonable attorney's fee . . . to be paid by the defendant.'") (quoting 29 U.S.C. § 2617(a)(3)); *Franzen v. Ellis Corp.*, 543 F.3d 420, 432 (7th Cir. 2008) (holding that plaintiff who proved FMLA violation but failed to prove damages was not entitled to attorney's fees because no "judgment" was "awarded to the plaintiff"); *see also Dawson v. Leewood Nursing Home, Inc.*, 14 F. Supp. 2d 828, 834 (E.D. Va. 1998) (holding that FMLA plaintiff with "no chance of recovering any damages" may not "proceed to trial merely to recover attorney's fees").

The Fourth Circuit's decision in *Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir. 1995), confirms that plaintiff lacks an injury-in-fact owing to defendant's corrective action. *See id.* at 156. In *Dennis*, an African-American employee alleged that his employer discriminated against him by issuing a disciplinary memo and retaliated against him for filing an EEOC charge by giving him annual performance review scores lower than his previous year's scores. *See id.* at 153. In response to the employee's grievances, the employer "removed [the employee's] disciplinary memo from his personnel file within two weeks and raised his scores to their prior level without undue delay." *Id.* at 156. Because of the employer's corrective action, the employee's "lack of injury-in-fact . . . bar[red] judicial redress." *Id.* (holding that judgment was properly granted in the employer's favor pursuant to Rule 50, Fed. R. Civ. P.). So, too, here; plaintiff's FMLA retaliation claim challenges actions corrected by defendant before this suit was filed, and plaintiff cannot show that she is entitled to any damages or further equitable relief. *See id.* ("Where an employer has taken prompt and effective corrective measures to address alleged

incidents of racial harassment, the employer is not liable because its final act was not of a discriminatory nature.").

Plaintiff argues that *Dennis* is distinguishable from this case because defendant did not rescind the March 26, 2018 Final Written Warning until August 2, 2018. Plaintiff's argument is unpersuasive because it focuses only on one aspect of corrective action in *Dennis*, namely the withdrawal of the employee's disciplinary memo within two weeks. Yet, a comparison of this case's record with *Dennis*'s record makes clear that defendant here rescinded the Final Written Warning almost as promptly as the employer in *Dennis* agreed to raise the employee's scores and more promptly than the employer in *Dennis* formally acted to raise that employee's scores. *See Dennis*, 55 F.3d at 156 (noting that the employee's scores were raised "without undue delay"); Brief for Appellant at 16–17, *Dennis*, 55 F.3d 151 (No. 94-1689), 1994 WL 16014617, at *16–17 (stating that employer agreed on January 28, 1993 to raise scores given in September 1992 and formally raised scores on May 23, 1993). Accordingly, *Dennis* is not distinguishable from this case; defendant here took corrective action in a manner consistent with *Dennis*, and therefore plaintiff lacks standing here because of defendant's timely corrective action.[33]

In the course of oral argument in this case, plaintiff's counsel argued that the standing result reached here would inappropriately encourage employees to file suit early and thereby prevent an employer's corrective action from creating a standing defense. This argument is unpersuasive; it focuses too narrowly on standing. An employer's corrective action taken after suit is filed may give rise not to a standing defense but to a claim of mootness. In other words, a

---

[33] Plaintiff also argues that *Nelson v. Watergate at Landmark*, 108 F.3d 1373 (table), 1997 WL 73555 (4th Cir. 1997), illustrates that corrective action is unduly delayed when five months pass between an alleged discriminatory action and an employer's corrective action. Plaintiff misunderstands *Nelson*; there, the employer "took no corrective action regarding the discrimination claim." *Id.* at *2.

claim brought by a plaintiff with standing to sue may still be rendered moot by an employer's corrective action taken before or after suit is filed. *See Friends of the Earth, Inc.*, 528 U.S. at 190 (allowing voluntary action to render a case moot where "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"); *see also Blumenthal v. Murray*, 946 F. Supp. 623, 626 (N.D. Ill. 1996) (holding that employee's FMLA claim was moot where employee was reinstated, received repayment for insurance premiums, and was not entitled to prospective injunctive relief). And an employer's corrective action taken after the filing of suit may preclude an FMLA plaintiff from proving damages or establishing a need for injunctive relief. In that event, a plaintiff would not obtain a judgment and thus would not be able to recover attorney's fees. *See Franzen*, 543 F.3d at 432 (holding that plaintiff who proved FMLA violation but failed to prove damages was not entitled to attorney's fees). Thus, although a plaintiff may have an incentive to file suit early to preclude corrective action from erasing standing, this would not discourage employers from taking corrective action because it might moot the plaintiff's claim or, more importantly, simply because it is the right thing to do.

In sum, defendant is entitled to summary judgment on plaintiff's FMLA retaliation claim because plaintiff lacks standing to bring this claim; plaintiff has not presented evidence of an injury-in-fact that can be redressed in light of defendant's prompt and effective corrective action.

**B.**

In contrast to plaintiff's FMLA retaliation claim, plaintiff has standing to maintain her Title VII retaliation claim because Title VII provides a broader range of remedies than are provided by the FMLA, and defendant's corrective action does not eliminate all of plaintiff's

possible retaliation remedies. *See, e.g.,* note 32, *supra* (explaining that emotional distress damages are recoverable under Title VII).

Plaintiff's Title VII retaliation claim is analyzed under the familiar *McDonnell-Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973). Under the *McDonnell Douglas* framework, a plaintiff claiming Title VII retaliation must make a *prima facie* showing (i) that she engaged in protected activity, (ii) that the employer took materially adverse action against her, and (iii) that the materially adverse action was causally connected to the plaintiff's protected activity. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019). Once the plaintiff establishes a *prima facie* case of retaliation, the employer must offer a non-retaliatory explanation for the adverse action. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). If the employer offers a non-retaliatory reason, the plaintiff must establish that the employer's explanation is a pretext for retaliation. *See id.*

Notwithstanding defendant's concession that plaintiff satisfied the *prima facie* case's first step when she contacted HR representatives about Yates-Williams's conduct, plaintiff's Title VII protected activity must be precisely identified so that it can be determined whether the record discloses that the person or persons who took materially adverse action knew of any Title VII protected activity. An employee who has "opposed any practice made an unlawful employment practice" by Title VII has engaged in Title VII protected activity. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (citing 42 U.S.C. § 2000e–3(a)). Opposition activity includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). But, as the Fourth Circuit has made clear, "Title VII is not a general bad acts statute . . . and it does not prohibit

private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside of the scope of Title VII." *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (quoting *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011)). To qualify as engaging in Title VII protected activity, an employee must direct opposition activity toward an employment action that is "actually unlawful under Title VII" or that an employee "reasonably believes to be unlawful." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc); 42 U.S.C. § 2000e–3(a).

To be sure, the FMLA protects plaintiff's right to assert her beliefs regarding her rights under the FMLA, request FMLA leave, and complain about Yates-Williams's treatment of plaintiff following those requests. *See* 29 U.S.C. § 2615(a)(2); *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006) (stating that the FMLA protects "employees from discrimination or retaliation for exercising their substantive rights under the FMLA"). Plaintiff engaged in FMLA protected activity on multiple occasions. *See* Part I, Fact 13 ("In reference to your text from this morning regarding my plans for future use of FMLA, I was under the impression that I did not have to notify INOVA until just before utilizing it."); Facts 20–21 (complaining to Stancil regarding Yates-Williams's change in behavior toward plaintiff after January 5, 2018); Fact 33 (complaining in an email to Byrum that "Margo's bullying has escalated since I've filed my STD/FMLA (maternity leave) paperwork").

Title VII does not protect plaintiff's rights to assert her beliefs regarding her FMLA rights, request FMLA leave, or complain about disparate treatment based on her request for FMLA leave. *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation because an employee "has opposed any practice made an unlawful employment practice *by this subchapter*) (emphasis added). Title VII, as amended by the Pregnancy Discrimination Act, "does not . . . require

employers to offer maternity leave." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994); *see also* 29 U.S.C. § 2651(a) ("Nothing in this Act [the FMLA] or any amendment made by this Act shall be construed to modify or affect any Federal or State law prohibiting discrimination on the basis of race, religion, color, national origin, sex, age, or disability."). Thus, when plaintiff opposed Yates-Williams's actions in response to plaintiff's January 5, 2018 refusal to provide anticipated dates for FMLA leave and her March 1, 2018 formal request for leave, plaintiff did not oppose practices actually made unlawful by Title VII. *See Stennis*, 716 F. App'x at 167 (holding that student failed to allege Title VII opposition activity based on sex discrimination complaint because Title IX protects students from sex discrimination).

The District for the District of Columbia's decision in *Salak v. Pruitt*, 277 F. Supp. 3d 11 (D.D.C. 2017), illustrates the distinction between FMLA protected activity and Title VII protected activity related to pregnancy. There, an employee did not engage in Title VII protected activity when he threatened to file an FMLA grievance after his supervisor denied sick leave that the employee requested following his child's premature birth. *See id.* at 23 (citing *Saellam v. Norfolk S. Corp.*, No. 06–0123, 2008 WL 5286836, at *11 (W.D. Pa. Dec. 19, 2008)).[34] But the employee in *Salak* later engaged in Title VII protected activity by protesting his supervisor's actions in a written memorandum asserting that "an employer may not single out pregnancy-related conditions for special procedures related to an employee's work or sick leave." *Id.* Here, similar to the employee's threatened FMLA grievance in *Salak*, plaintiff's complaints to Yates-Williams, Stancil, and Byrum were not Title VII protected activity because plaintiff did not

---

[34] The result reached in *Salak* is consistent with *Testerman v. Procter & Gamble Mfg. Co.*, Civ. No. CCB-13-3048, 2015 WL 5719657 (D. Md. Sept. 29, 2015), where another district court within the Fourth Circuit held that a plaintiff's statement of intent to "get an attorney" did not establish employer's knowledge of Title VII protected activity because her statement "was made in the context of a discussion concerning FMLA leave." *Id.* at *8.

complain of disparate treatment under Title VII because her request was pregnancy-related. *See id.*

Presumably because defendant conceded that plaintiff's complaints to HR were protected activity under Title VII and the FMLA, plaintiff did not address in her briefing whether plaintiff "reasonably believe[d]" that she was opposing conduct made unlawful under Title VII on January 5, 2018, March 1, 2018, or March 13, 2018. *Boyer-Liberto*, 786 F.3d at 282. Plaintiff could not have entertained a reasonable belief that her January 5, 2018 email challenged conduct unlawful under Title VII because Title VII does not govern whether and when an employee must provide notice of foreseeable FMLA leave. *See* 29 U.S.C. § 2612(e) (requiring employees to "provide the employer with not less than 30 days' notice, before the date the leave is to begin" based on foreseeable pregnancy, adoption, care for employee's family member's serious health condition, or the employee's own serious health condition). Even assuming *arguendo* that plaintiff reasonably believed that she was opposing a practice unlawful under Title VII on each occasion plaintiff complained about Yates-Williams's conduct, plaintiff cannot show that any relevant decisionmakers knew of plaintiff's Title VII opposition activity at the time any adverse employment action was taken.

To satisfy the *prima facie* case's second requirement—materially adverse action—a plaintiff must show that the employer's action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1217–18 (D.C. Cir. 2006)). As the Supreme Court has made clear, adversity must be "*material*" because "it is important to separate significant from trivial harms." *White*, 548 U.S. at 68 (emphasis in original).

Plaintiff argues, and defendant assumes, that the following actions were materially adverse: (1) investigating plaintiff for sleeping during breaks, (2) suspending plaintiff without pay based on the investigation's findings, (3) issuing plaintiff a Final Written Warning based on the investigation's findings, (4) preventing plaintiff from serving as a trauma blue responder following issuance of the Final Written Warning, and (5) passing over plaintiff for an opportunity to move to a permanent day shift. Notwithstanding defendant's concession, it is important to make clear which actions qualify as materially adverse actions so that the identity of the person or persons taking those action can be ascertained. Once the identity of the person or persons who took the materially adverse actions is ascertained, then it is important to determine whether the summary judgment record presents a triable issue of fact as to whether that person or those persons knew of plaintiff's Title VII protected activity.

Both plaintiff's suspension without pay and removal from the trauma blue responder role constitute materially adverse actions because they changed plaintiff's compensation or job responsibilities. *See White*, 548 U.S. at 70–72 (noting that jury reasonably concluded that both employee's reassignment to position that required fewer qualifications and suspension without pay for which plaintiff later received backpay constituted materially adverse actions); *see also Harden v. Wicomico Cty., Md.*, 436 F. App'x 143, 146 (4th Cir. 2011) (holding that employee who returned after suspension without pay and had fewer supervisory powers suffered adverse employment action).

It is also clear that plaintiff's placement under investigation and receipt of a Final Written Warning resulted in materially adverse consequences in this case. To be sure, absent "any tangible harm that resulted from the investigation," an employee's "placement under investigation itself does not constitute an adverse action." *Jones v. Castro*, 168 F. Supp. 3d 169,

180 (D.D.C. 2016) (concluding that investigation that did not result in loss of opportunities for promotion or reduction in salary was not a materially adverse action). Here, however, plaintiff's placement under investigation rose to the level of a materially adverse action because the investigation resulted in plaintiff's suspension without pay. *See id.*; *White*, 548 U.S. at 72 (affirming jury's verdict that suspension without pay for which employee received backpay was a materially adverse action). It is far from clear that a written reprimand such as the Final Written Warning here would constitute materially adverse action if it had no effect on an employee's position, pay, or benefits.[35] But the Final Written Warning's issuance constituted an adverse action here because it resulted in plaintiff's removal from the trauma blue responder role. *See White*, 548 U.S. at 71 (affirming jury's verdict that employee's reassignment to position that required fewer qualifications was materially adverse).

Finally, plaintiff did not suffer a materially adverse action based on her perception that she was passed over for an opportunity to switch to a permanent day shift because no such opportunity was available and plaintiff specifically stated her lack of interest in switching shifts. The use of red highlighting for plaintiff's point total and plaintiff's exclusion from a list of nurses next in line to request a permanent day shift would not deter a reasonable employee from engaging in protected activity because at most, those actions are "petty slights or minor annoyances that often take place at work." *White*, 548 U.S. at 68.

Although plaintiff experienced materially adverse actions, she cannot avoid summary judgment on her Title VII retaliation claim because she cannot show a triable issue of fact as to

---

[35] *See Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) (holding that a reprimand letter that contains no tangible adverse consequences, but rather is merely "directed at correcting some workplace behavior that management perceived as needing correcting" is not an adverse employment action for the purposes of a Title VII retaliation claim). *Contra Hamby v. Assoc. Ctrs. for Therapy*, 230 F. App'x 772, 778 (10th Cir. 2007) ("Hamby began receiving an increased number of reprimands, a challenged action which a reasonable employee would find materially adverse.").

27

whether the defendant took adverse action because of her Title VII protected activity. Although defendant correctly assumed that the *prima facie* case's third requirement—causation—is satisfied here given the close temporal proximity between plaintiff's protected activity and defendant's materially adverse action, that does not end the summary judgment analysis. *See Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (noting that close temporal proximity is sufficient to show causation at the *prima facie* stage). This is so inasmuch as beyond the *prima facie* stage, "[t]emporal proximity establishes nothing" where a decisionmaker "was unaware that his decisions came on the heels of any protected activities." *See Smyth Riding v. Sci. & Eng'g Servs., LLC*, 699 F. App'x 146, 153 (4th Cir. 2017) (affirming grant of judgment pursuant to Rule 50, Fed. R. Civ. P., because no reasonable juror could conclude that employer knew of protected activity). Thus, in a Title VII retaliation claim, evidence of "the employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary" to establish a triable issue as to whether employer took materially adverse action "*because* the plaintiff engaged in protected activity." *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). When determining whether an employer should have understood that an employee engaged in protected activity, the Fourth Circuit examines "not just the employee's complaint but also the factual context that is known to the employer." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 336 (4th Cir. 2018) (citing *Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011)).

Here, plaintiff cannot prevail on her Title VII retaliation claim because she has not presented evidence to create a jury issue that the relevant decisionmakers for the materially adverse actions—namely, Vassallo and Yates-Williams—knew of plaintiff's Title VII protected

activity at the time of the actions. *See Dowe*, 145 F.3d at 657 (observing that "an employer cannot take action because of a factor of which it is unaware"). Yates-Williams lacked knowledge of any Title VII protected activity when she made the decisions (i) to investigate plaintiff for sleeping during shifts, (ii) to suspend plaintiff without pay as a result of the investigation, and (iii) to remove plaintiff from the role of trauma blue responder. Specifically, the record reflects that Yates-Williams did not know of plaintiff's complaints to HR personnel until she was served with a subpoena in connection with this suit. *See* Part I, Fact 28 & n. 5, *supra*. Yates-Williams could not have understood plaintiff's January 5, 2018 email to be Title VII protected activity. That email refers only to the FMLA's notice requirements for foreseeable leave.

To be sure, Yates-Williams knew of plaintiff's pregnancy prior to requesting plaintiff's anticipated dates of FMLA leave. *See* Part I, Fact 7. But plaintiff's January 5, 2018 email does not mention pregnancy or contain any "term of art" typically associated with a Title VII claim. *See Strothers*, 895 F.3d at 336 (holding that genuine issue existed as to employer's knowledge where employee used terms of art such as "harassment" and "hostile work environment" in written complaint); *Okoli*, 648 F.3d at 224 (observing employer "surely should have known that [plaintiff's] complaints of 'harassment' likely encompassed sexual harassment"). The January 5, 2018 email's assertion of plaintiff's beliefs about her right to delay providing her FMLA notice did not inform Yates-Williams that plaintiff had engaged in Title VII opposition activity.

The record also reflects that Vassallo was not aware of plaintiff's complaints regarding Yates-Williams or defendant Inova when Vassallo made the decision to issue plaintiff a Final Written Warning. *See* Part I, Fact 60. Accordingly, Vassallo could not have issued plaintiff's Final Written Warning because of those complaints. *See Dowe*, 145 F.3d at 657. And any

argument that Vassallo, the decisionmaker, served as a conduit—or "cat's paw"—for Yates-Williams's retaliatory animus must fail because, as noted above, Yates-Williams also lacked knowledge of plaintiff's Title VII protected activity. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (requiring a plaintiff to show that a biased supervisor's action was "a proximate cause" of the adverse action).

Seeking to avoid this result, plaintiff contends that Vassallo's knowledge of plaintiff's communications with HR personnel may be inferred from the summary judgment record. Plaintiff's argument is unpersuasive because plaintiff seeks to "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). First, plaintiff relies on Byrum's March 13, 2018 email responding to plaintiff's complaints about Yates-Williams "singling out staff and bullying them" and the escalation of Yates-Williams's bullying "since I've filed my STD/FMLA (maternity leave) paperwork." Byrum wrote that "[t]his issue is currently being investigated and has been escalated to senior management and will be addressed appropriately. Vivian has updated me and reported all details including your further concerns that you reported to her yesterday." Plaintiff contends that Byrum's reference to "senior management" shows a dispute of fact as to whether Vassallo knew of plaintiff's protected activity. But, as defendant points out, this asserted dispute is not genuine because plaintiff's argument rests on inferences (i) that "[t]his issue" refers to plaintiff's specific retaliation complaints rather than the concerns about Yates-Williams's bullying expressed by several nurses, including plaintiff, (ii) that Byrum's reference to "senior management" refers to senior nursing management, which could include Vassallo, rather than senior HR management only, and (iii) that senior nursing management necessarily includes Vassallo. Plaintiff cannot rely

30

on this chain of inferences to create a genuine dispute of fact as to Vassallo's knowledge of plaintiff's Title VII protected activity.

Second, plaintiff argues that it is reasonable to infer that Stancil informed Vassallo of plaintiff's retaliation complaints against Yates-Williams during the March 22, 2018 meeting. Plaintiff bases this inference on Stancil's March 21, 2018 email referring to the "legal implications" of terminating plaintiff and Stancil's ability to convince Vassallo not to terminate plaintiff. Stancil's statement that termination of plaintiff, a pregnant woman who had recently requested FMLA leave, could have "legal implications" does not support plaintiff's urged inference that Vassallo learned of plaintiff's Title VII protected activity based on this email. And Stancil's testimony establishes that Yates-Williams was discussed during the March 22, 2018 conversation only insofar as "we [the meeting participants] wanted to be fair and to make sure that we weren't moving too quickly." Stancil Dep. Tr. at 109:25–110:7. Plaintiff's "mere speculation" that Vassallo would have understood "legal implications" to mean that plaintiff had engaged in protected activity and that plaintiff's complaints were discussed during the March 22, 2018 meeting does not show a triable issue as to Vassallo's knowledge of plaintiff's Title VII protected activity. *See Othentec Ltd.*, 526 F.3d at 140 (quoting *Beale*, 769 F.2d at 214). Accordingly, no record evidence indicates that Vassallo knew of plaintiff's Title VII protected activity.

\*  \*  \*

In summary, plaintiff's FMLA retaliation claim fails for lack of standing because, as a result of defendant's corrective actions, plaintiff has not suffered an injury-in-fact and cannot show any redressable injury. Further, plaintiff's Title VII retaliation claim fails because the summary judgment record reflects that there is no evidence that the persons who decided to take

31

materially adverse actions against plaintiff knew of plaintiff's Title VII protected activity, and the decisionmakers' lack of knowledge of plaintiff's Title VII protected activity is fatal to plaintiff's claim.

## IV.

For the foregoing reasons, defendant is entitled to summary judgment on plaintiff's FMLA retaliation and Title VII retaliation claims.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
May 1, 2020

/s/

T. S. Ellis, III
United States District Judge

32